5-50010. I'm sorry, it's not that one. It's 25-10259. Kennedy v. City of  And we'll begin with Shelby White. That's me. Good morning, Your Honors. May it please the court. My name is Shelby White. Today I represent the appellant in this case, Ms. Brittany Kennedy, the widow of Marques Kennedy here. This is a 12B6 dismissal case. So we are not here for a factual dispute. We are not here about who has the right version of events and who has the wrong version of events. We're here about whether or not we've sufficiently pleaded a 1983 case. Obviously, this is a unique situation because Mr. Kennedy is a cadet and he was injured or ultimately killed by other officers during a training exercise. But as Collins and some of the other cases established, that does not remove him from 1983. The fact that you are a government employee when another government employee injures you does not mean you're not entitled to present a 1983 claim. The main issue that the magistrate judge focused on, which the district court adopted that opinion, is the element of seizure. So that's what I want to start with. Kennedy is seized because he has revoked his consent to the mutual combat situation. One of the main tenets of tort law is there's no mutual combat without mutual consent. So if we take the scenario outside of this training exercise, if, you know, Judge Duncan, if you and I said, let's go to the jiu-jitsu training center, you and I are going to spar for a little bit. And during the sparring, I said, hey, I need a break. I need some water. I've revoked my consent. You can't then continue to punch me in the face. And that's what we have here. We have an initial agreement to mutual combat. And then he says, I need a break. I need water. And you can see on the video, I believe that's at minute 9 30. He asked for water, and they said we're asking for water. You can't have it. And then they continue the combat exercise. And so at that point, he has been seized. The the allegation with respect to withdrawing consent. You just mentioned the water. Is there anything else? Wasn't there something about hard? Yes, there's an officer in distress card that comes later at about minute 14 in the final fight. And so our point is that multiple points in this exercise, he attempts to revoke his consent and is ignored. So specifically, um, what? So do you think that we can consider the video with respect on a 12 B six because it's referenced in the complaint? I think in this case, we don't have an issue with y'all considering the video because we believe the video supports our position in terms of whether or not that's appropriate under the law. I think there's probably a bit of a debate about that, but we're not contesting the consideration of the video here. We need. Yeah, the video. We've got the video. Um, yes, because this is a situation where we referenced it, but they were the ones that attached it to their contend that the withdrawal of consent with respect to the water. Well, I mean, is that is that does that go to consent? Do consent to be with respect to seizure of the water incident? What do I'm not sure. Well, you said you said the video shows that, you know, there's been a withdrawal of consent, but I'll look at the card thing because that that does seem to go to consent. But how does the water? So the water goes to consent in the sense of he is during the training exercise. He is not allowed to take breaks. And so when he asked for water, he's asking for a break, which ends the exercise. And so when he's making a request in the exercise and they say, No, you can't. Um, that is him indicating an intent to revoke his consent and them saying we're not recognizing that replication. We're gonna continue this exercise. Do you? Do we have any information about the from your pleadings, I guess, or from the video about the sort of parameters of the training exercise? Yes, we do. So it is. And with specific with respect to I'm requesting water that this sort of thing, you know, like, Can you stop the training exercise and say I need some water? Is that part of the training exercise that you go through without asking for water? I don't know. And you can hear that on the video multiple times. And I'm not sure if you have seen the video yet, because I saw that it had been mailed. We've got it now. We've got it now. Okay, perfect. So what the training exercise requires and you can hear them saying multiple times during the video, you can't have water yet. You can have water when this is over. Yeah, that's why I asked. What are the parameters of the training? So the parameters were that he cannot take breaks and he cannot have water until all four exercises are complete. And if he doesn't, if he takes a break or gets water before it's complete, he will have to redo the whole thing. And so he's basically he's failed the training exercises and we'll have to start over and redo that. Okay. Does that? Yeah. Yeah. I still don't understand how that goes to consent, because it seems like if the parameters of the training exercise or you don't get breaks, you don't get water during the training exercise. Yes. And so my point is that if he was not allowed to do that and he said, Hey, I want to. I want the break. I need the break. He's now saying, I don't want to participate in this training exercise anymore, which is a revocation of his consent. Oh, okay. Does that answer your question? I understand your argument. Yes. The second we also see kind of in the same vein. He takes out his mouth guard multiple times and they say at one point, if you take your mouth guard out one more time, this is over. And he does. Actually, I think his back is to the video, but he takes his mouth guard out again before the final exercise. You can see him put it back in. He also turns his back to the instructors and faces the wall, which in we have an expert, which I know we're not at that point in the stage. But one of our experts says in standard jujitsu training, if you turn your back to your opponent, that is an indication that you're not intending to participate anymore. And then lastly, we have the officer in distress card, which happens at minute 15 oh five. I think that that fights. I said a minute 14 earlier, and I apologize about that. But at minute 15 oh five, he's handed the card, and then he then drops the card, indicating that he is in distress and can't participate anymore. And he continues to be punched for about, I everyone goes, Hey, I think he's not okay. We need to stop this. So, uh, so you say he's he's a trainee. I get that. That makes this an unusual case. I don't think I've seen one way. I did not find any other Fifth Circuit cases that had a trainee scenario like this. When you're talking about revocation of consent to me, that is the main issue. We have a DPS case that can't be, I believe, is the case name or something else with a C. I might be quoting at where a DPS officer was in training and was assaulted and killed. But there was not an issue as to whether or not he had agreed to participate. The underlying Constitution. You have to have an underlying federal violation to have a section 1983. Yes, right. So what? What is it? The underlying violation is that once he's revoked his consent to participate in mutual combat, it is assault. Okay, so is that a Fourth Amendment claim? Yes, it be fourth and 14th. And you're right to bodily integrity. Okay, hard. Okay, help me with that. Because obviously, in the normal Fourth Amendment context, it's very different from this situation. Yes, of course. Normal Fourth Amendment context, obviously, as well. The police restraining a suspect. They seize a suspect. They arrest somebody. They search this. This is a training incident. So how does the Fourth Amendment map onto that? So the Fourth Amendment maps onto it because you have a right to bodily integrity. And once you are no longer if before we started before the revocation of consent, I don't think we have a Fourth Amendment claim because we have mutual combat and we have mutual agreement to participate in it. But once he has revoked his consent, he is not agreeing to participate, which means you were assaulting him without his consent, and you have no reason to assault him. So it'd be the same as if an officer walked up to civilian in the street and punched him in the face. Has it has any? Do you have any cases? I may be not remembering them from your brief, but you have any cases that apply the Fourth Amendment in that kind of situation. So we don't have another case that has an officer training where we're looking at a revocation of consent and then a continued assault. There is not a case that other circuits. No, there's not any other circuits that have the same situation we have here. What we would have analogous to this is you stopped resisting arrest. You know, I had I had a reason to use force against you. And now that reason to use force is gone, and I cannot continue to use force against you. So that's I think it is analogous to any other case where the use of force extends beyond what is appropriate or what was within the realm of the law that any officer who came up to civilian and just assaulted them would know that they're not allowed to do that. And so in the same scenario, once your consent to participate in this exercise has ended, once you've said, I don't want to do this anymore, I want this to be over. If an officer continues to assault you, the officer is just assaulting you with no reason and with no justification. Forgive me. Remind me of the procedure. This is this is 12 B. Six dismissal of the claims. Yes, was the was the basis of failure to state a claim was the basis qualified immunity or both. So the excuse me, the magistrate judge said that there was no seizure, and because there was no seizure, there was no constitutional violation. And so then, because there was no constitutional violation, we did not have bystander claims. We did not have the medical failure to render aid claims, and then we didn't have Monel claims with it. So that was kind of the first domino and toppled everything else. But the decision was based on the magistrate saying there was no seizure here. And so when we get to the seizure analysis, the case law has always been clear that a seizure is one. It could be by force, or it could be verbally. But it is you as the person being seized, understanding that your freedom of movement is restricted. And so it is not specific to being arrested. It's not specific to being detained. It is just or, you know, being a detainee is a title. It is just did I understand that my movement was restricted? I was not free to leave. And so here we have, I would say, both a verbal restraint, which is he asked for the for the fight to be over, and they asked for water, asked for a break, and they say no. And then also the fact that they continue to assault him after this in the same context, dropping the officer in distress card and the assault continues to see it. I don't I haven't read your complaint yet. The does he have state law claims against the city? No, I don't believe so. Do you know? Are there are there avenues for state law claims, tort claims, negligence claims, these kind of things against the city for negligent training or anything like that? Maybe I guess you haven't brought them. So, yeah, I honestly, that might be out of my realm at this point. My co counsel is the one that trial counsel is the one that put the complaint together, and I'm sure that he made considerations as to that. Um, but I'm sure there is probably some situations in which that is an available avenue, but it might not be appropriate here. Yeah. Yeah, I think the state and things like yes, I certainly know in the the claim against the DPS officers, there was a state immunity issue, but that was also the Department of Public Safety, which is a state entity which changes the factual scenario a little bit. Forgive me. I was asking about quality. No, you're fine. Um, so the second issue when we're talking about seizure is I think what opposing counsel has brought up is this idea that the officers didn't intend to seize him, and therefore it's not a seizure. Subjective intent does not matter for seizure purposes. Is it? It is only an objective analysis. And so we don't look at subjectively whether the officer intended to seize you or subjectively whether the person understood that we're they were being seized. We look at whether objectively a reasonable person viewing this would understand it to be a seizure. And so when we look at this objectively, we've got show force, verbal verbal denial of your opportunity to leave or your opportunity in the exercise. That's when it becomes a seizure. Even if done, the officers really thought or intended for that to be what they were doing. The second thing I want to talk about is the clearly established law, which is that the laws clearly established that no reasonable officer would believe that they could assault a person who was not doing anything wrong and who did not consent to being assaulted. This is independent, really, of whether or not the officer subjectively intended to seize him, because regardless of the situation in which his consent was revoked, the fact that he revokes it means they cannot continue to assault him. And so we're going to talk a little bit about that in a Once he's revoked his consent, he's like any other police officer, excuse me, like any other civilian they might have encountered in the street, which means they can't go up and assault him. We're talking about establishing a claim of excessive force under the Fourth Amendment. We've got injury clearly resulted directly and only from a use of force, which was clearly excessive in the excessiveness of which was clearly unreasonable, which means we need to look to the need for force and the relationship between the need and the amount of force used. This circuit is long held that is objectively unreasonable for an officer to use injurious force against a non-resisting, non-dangerous individual who is not suspected of a serious crime. So that's Aguirre, that's Darden, that's Joseph E. Bartlett. And the law is clearly established if someone's not resisting, there is no amount of force that is justified. And so that's where our clearly established law prong analysis comes from, is this sense of once he's not consenting to the assault anymore, once the assault is just kind of a free-for-all, that the law is clearly established, that there is no situation where an officer is allowed to do that. The last thing I want to talk about is the medical claim. And so the bystander liability and I know we address this probably the most in our reply brief in responding to their allegations about it being waived and about adequately alleging claims against multiple officers versus an individual officer. You are not entitled to have your medical emergency ignored by the people who created that medical emergency and who who have restrained you in a way that you cannot go seek medical care on your own. And so at the point that he has been assaulted and then he, it's too weak to continue and basically passes out, he's not able to seek medical care on his own and the officers are the ones that are responsible for providing that for him. The last thing that I want to talk about too is, to clarify a little bit, when you look at this video, I would not say that you see someone who is being physically punched and abused. This is a training simulation. So I don't want to leave you all with the impression that you see that he's got bruises all over him because he's been punched so many times. The punches are, for the most part, simulations so they do make contact, but he is, they're sitting on his chest for 16 minutes. They're sitting on his stomach and his chest and they're laying on top of him. He is, it's akin to being in a prone restraint in terms of oxygen deprivation. That's part of the, that's part of the training. Yeah. And well, and that's what ultimately causes his distress and his injuries is that he is deprived of breath for an extended period of time before he finally passes out. Okay. Yeah. But with that, we would ask the reverse and remand. Okay. You've said time for a model. We'll now hear from Christopher Livingston. May it please the court. Christopher D Livingston on behalf of the individual officers, we ask that you affirm the district court's decision. I want to address the officer's response to the appellant that there was no underlying constitute or that there was an underlying constitutional violation. Then talk about the clearly established law and finally address how they have allegedly ignored their, his medical care. First off, let's start with something that we agree with appellant on. And that is that there does not need to be a subjective investigation here. It is definitely an objective test and you need to look objectively at whether it looked like there was going to be a seizure. I see an officer seizes a person when he, by means of physical force or show of authority, has in some way restrained the liberty of a citizen. And that must be done with intentional means. Here we're in a gym doing a training exercise. It is objectively unreasonable for the court based on their pleadings or anything. It's there's no intent to restrain. There's no tent to detain. There's no intent to apprehend. There's no intent to arrest. The intent is to train. Well, they may have some sort of tort action in a state court. This is not made it to the level of a constitutional tort. I guess this is why they're focusing on the consent angle, right? I think that I think they agree with you insofar as there was consent. Yes. And specifically with regard to the consent, what I agree there's I don't know that he stops once he asked for water. He has asked. He says, No, you can't have water. And he continues. He voluntarily continues into the training. The I. D. Card. You can hear it clearly on the video. That's what they say. Here's my I. D. Or you want I. D. Here's I. D. That's the same thing that I had to go through. And many of the attorneys had to go through as we came here. I presented I. D. At the airport. I presented I. D. At my hotel. I presented I. D. When I walked in here this morning, I. D. Is identification. It is not an officer distress. She mentioned a minute 15 right? What they're doing is a simulation of a fight where the person it's clear on the video. He presents the I. D. And then he starts to throw a punch. So you're supposed to defend yourself after you have taken the I. D. And drop the I. D. So that you can start punching. It is not an in distress card. If it was an in distress card, he would have had it at the start of the simulation so that he could have dropped it at any point in time during the 15 minutes. Because this is a 12 B six ruling, do we have to accept the allegation that it was an officer distress card? No, you do not. Because you could watch it on the video. They have they have specified in their allegations in their complaint. And in fact, they have attached an affidavit from Mrs Kennedy describing the video in her mind that that lay person's view. You don't have to accept that because at the point that the video by them making the video part of their complaint and the city producing the video, you take the video from an objective standard. What does it show? It's kind of hard to hear what the officer said. You can see the tendering of this orange card, but it's hard to hear what the officer saying. Okay, it's it was not hard for me to hear when and I may be biased because I've represented police officers for years and I was trying to be considerate of the people next door by not turning the volume all the way up. Yeah, right. And but he says, I heard him say, you need I. D. Here's I. D. And then he picks up. Mr. Kennedy grabs the I. D. And he is instructed to drop the I. D. Um, I think he's instructed to drop the I. D. Or or one of the people comes to put him, get him to drop it because you're supposed to drop the I. D. And start the simulation. Um, even even there, though, the next step is that there has to be an injury. That was the result of clearly excessive force that was clearly unreasonable. So we're still looking if at that point that we don't have any type of clearly reasonable conduct again, they're not trying to restrain. But on the record and appeal at 5 46, the plaintiffs have attached the medical examiner's report and the medical examiner's report says there is no apparent trauma to Mr. Kennedy at all. And that's because this isn't I. They use some hyperbolic language that it was a beating and things like that. And that's just not what this is. This is a training. Do we only consider that if we get to the qualified immunity analysis? No, I think that's that's still under the constitutional analysis. The next the next part would be the qualified immunity analysis, which the district court didn't get to. Um, well, let me let me rephrase that. So the qualified immunity analysis is two prongs. There has to be a constitutional violation, and it has to be clearly established law. Basically, the court weighed in on the first prong and never addressed the second prong. Um, as you said, not a constitutional issue, he said. Not a constitutional issue. It's not a constitutional tort. So I don't have to look at whether there's clearly established law. But as as appellant has pointed out, you know, they don't have another case, even from another circuit that shows that this was clearly established that an injury during a training exercise could lead to a constitutional tort or rise to the level of constitutional tort. And, you know, whether they have any remedy under state law. I do not know whether or not they have a remedy under state law. Um, yeah, I don't know whether or not they have a remedy under state law. I know that they've got a workers comp proceeding going, um, right now. That's that's all I know. Two cases that that we point to are Gorman versus Sharp, which again is a training exercise where the officer literally or the trainer literally pointed a gun and pulled the trigger. And they found that no, that was not the Fifth Circuit found that no, that was not a seizure under the Fourth Amendment. Yeah, I've heard of that case. Was there a mistake in the training? Was that what happened? Yes. Basically, what the what the supervisor, what the trainer was supposed to be doing is pulling what we call a blue gun, which is a fake gun and instead pulled an actual gun and pulled pulled the trigger. Um, also, Cardi versus Rodriguez, which appellant referenced or Miss White referenced during her opening. Cardi versus Rodriguez was a situation which was even worse, I would say, of a tragedy than we have in this case. There had been consistent showing that a training that the DPS troopers were going through caused head injuries, and yet they continue to do it. And the Fifth Circuit said, even though we have this continuous pattern of  no constitutional violation, no Fourth Amendment violation because it was an accident and it should be remedied under state law. The last thing that I'll point out is that Miss White talked about them ignoring the medical his medical care under the 14th Amendment. Again, it's gonna have to be a shocked your conscience standard for that bodily integrity situation. And they point out clearly that Miss Bateman, who is the first one listed, called 911 and asked for an ambulance to come. They thought Mr Kennedy was overheated. There's a second call shortly thereafter. Mr Kennedy is now, you know, not conscious. He's not breathing. We're doing CPR. Send an ambulance. The ambulance doesn't get there. There's a third call. Where's the ambulance will wave you at the gate. Get here quickly. The officers had no it. There's no intention here to do any type of harm, as the district court said, but it is a training exercise, and unfortunately, it's one that tragically went wrong. The officers, however, do not have liability because there's no constitutional violation, and there's no clearly established law that would show that the actions that they took would violate the Constitution. And therefore, we asked that the officers dismissal be affirmed. Thank you. Okay, well, now here we go. Thank you. Please court Joshua Skinner on behalf of the city of Arlington. I just wanted a very quickly address a couple of things in regards to the I D issue. Yes, Judge Ramirez. I understand the struggle with listening to the video, and it does require turning it up a bit in order to hear what said. But if you do turn it up, what you will hear at minute 14 2nd 45 is where an instructor tells Mr Kennedy. Ask this guy for his I D. Then at minute 15 0 seconds, he then Mr Kennedy then says to the sparring partner I D on you. Then at 15 oh 304 the idea is handed to Mr Kennedy and then at 15 0506 that the idea is dropped. So you can hear you can see it. It's there in the video. That's why it's so important to be able to use that in terms of looking at this. It's also important to keep in mind what the plaintiffs have alleged in their complaint, their allegation at in the record in their their second amendment complaint. But the record 492 and 4 93 is that Mr Kennedy continued to participate in this activity because he knew he had to pass it in order to be able to be successful and police academy. But that goes precisely this issue of consent. You can see it in the video and you can see it from their allegation. He was doing it because he knew his job as a police officer required completing the police academy and that required completing this training. Uh, that that meets the definition of consent in regards to this. That means he was consenting the closest case that I've been able to find. Um, it's from the D. C. Circuit back in 2000 and seven, the Pearson versus District of Columbia case, which we cited. And in that case, similarly, the court said there's no constitutional violation. You look to the participation, he shows up, he showed up that day knowing this is what was going to be happening. He knew the training exercises going on. See in the video, you can see him walk to the first training mat. You see pauses during it. Um, I know there was a reference in opposing counsel statement to people being on his stomach the whole time, but that's not accurate. You can see in the video there's various different training exercises. He gets up at different times, he moves around, they say, okay, let's restart. So then he goes, he lays back down and they start, say, a grappling exercise. Um, the final exercise, of course, we was standing for that one. Uh, he participated voluntarily all throughout that process. It's very sad that it turned out he had a medical condition that, that neither he nor apparently anybody else knew about. Uh, but going through that, the way the officers handled it, who were there, the trainers, you know, he did have to complete it in order to be able to pass the exam. Otherwise, as, as the plaintiffs allege in their complaint, he then would have had to do it again later. Of course, they're trying to encourage him to get it finished. Uh, it's better for him to be able to finish and be done and pass and move on. Uh, so they want to encourage him. They give him instructions, give him coaching. Like, that's not the technique. Try this, you know, pay attention to this aspect. You need to control that arm or that leg. That's the kind of guidance they're being given throughout it. When finally they become concerned that he appears to not be participating, seems to not be, you know, responding as they would have expected somebody in the, in the sparring match in that last match, they stop it and they ask him, are you okay to continue? Uh, and initially he's like, well, I just need some water. Like, well, we can't do the water, but are you okay to continue? And finally he says no. And they said, well, then we're done. Uh, and then they, they walk him off and that's the end of the video. Uh, so that's all throughout it. This is a matter of consent. It's a tragedy that we lost him. It's a tragedy for the city, for the police department, for his academy class, and of course, especially for his family. Uh, this is a tragedy. This is a really, uh, it's hard to imagine what, what it was like for them in terms of dealing with this. Uh, that, that tragedy, as much as we want to be able to help them through this and help them in whatever way, it doesn't change that it's not a constitutional violation. Uh, and that's really what we're here about today is whether it's a constitutional violation it's not. Uh, for those reasons, the city would ask that you affirm the decision, the dismissal of the district court. Okay. Thank you. We'll now hear the rebuttal. Thank you. First, I want to talk about the I. D. Issue very quickly again. This becomes a factual debate about what kind of card it was and what it when he dropped it. I would agree with you, Judge Ramirez, that you cannot hear what's on the video. Certainly you cannot hear what Marquess says because he is wearing a mouth guard and everything he said is muffled and he is on the verge of passing out at that point. If you can hear it on the video that someone says this is I. D. Do we have to go with what the video says versus the allegation? I don't even if he says that it doesn't change the nature of our allegation or the viability of our allegation, it could be and I called an I. D. Card and still be an officer in distress card in terms of what it means when he drops it. There is nothing that you hear on the video that says this is how this training I. D. Exercise is going to go and you're meant to drop it. And once you drop it, this is what it means or doesn't mean. I'm going to ask about the basis for the allegations in the complaint. Since these two stories that I'm hearing are diametrically opposed to each other. What is the basis? Our basis is interviews with two other rookie officers that participated in these exercises that mentioned there are officer distress cards that they are given and that dropping them is an indication that they want the fight to be over. Does your complaint allege when they're given the officer in distress card? No. And in the video you can see he's given it at the beginning of the last exercise. Well, that well, okay. And I mean, I would argue that when you watch the video, the types of extra the types of exercises are escalating in severity and degree. So you see at the beginning they have like not boxing gloves are kind of like the little hand wraps. They're not wearing as much protective gear and they're not making as much physical contact with him. And then as they go, the types of exercises change in the level of force used also changes. So at the end, the officer has boxing gloves on and does actually punch him in the face. I wouldn't say that it's the same as a full force punch used in an actual boxing match, but it is more than it's more than a glancing blow or a kind of touch simulation like you would see in some of the earlier ones. And so as the level of force used escalates, I would think it would make more sense that you're looking, you're asking them or providing them with an officer in distress card to stop that type of fight. And even, I mean, it, it just doesn't change the nature of what we're looking at here. They can call it whatever they want. They can say it is whatever they want. We have alleged that we have a pleading. We're at a 12 v 6 stage and what we've alleged in our pleading is what guides this analysis in terms of did we adequately plead that he revoked his consent. The second thing I want to talk about is the continued participation. When you're talking about a seizure, part of the element of the seizure is that you submit to the seizure. And so when they make the argument that, oh, he, he continued to fight, that's part of what makes it a seizure. It's kind of a, an interesting dichotomy of they're trying to argue that his consent is, you know, he's consenting to the fight. What we're saying is once he attempted to revoke his consent and they refuse to accept that revocation, of course he's going to keep fighting. What else is he going to do? They haven't accepted his revocation. He has to keep fighting. And so that is not a reconsent to continue the fight. The last thing I want to reiterate, and I know I've kind of talked about this a lot, is again, we're at the 12 v 6 stage. A lot of what they have addressed today and attempted to bring into this today is their version of events, their dispute about the facts. And that is not relevant here. The video supports our version of events or certainly doesn't fall into a Scott v Harris situation where it's so discordant with our version of events as to require you to disregard what we've said and only consider the video. What we have said aligns with what the video shows, and therefore you are you are bound by our pleadings in terms of analyzing whether we have sufficiently pled a cause of action in 1983. So once he's revoked his consent, that's where the 1983 comes in. That's let's assume that's all true. What about really established law? What about the second prong of qualified immunity? Yes, we do have clearly established law, which is basically it almost falls under a Graham open and obvious or obvious scenario. But once you've revoked your consent, once it is no longer mutual combat, there is there is no scenario where someone is allowed to keep beating you, and there's no officer that would believe I'm allowed to keep beating you. Certainly, if we get further down the line, we can have a debate about what the officers understood to be his revocation, what they thought his consent was. I think that's a valid debate later, but we're not at that point. What we're at now is we've alleged he revoked his consent, and that's enough under 1983 to meet the clearly established law prong that you can't be people up. Okay, thank you. We appreciate both sides arguments. I will say that regardless